

# In the Court of Criminal Appeals of Texas

No. WR-96,658-01

EX PARTE ERIC TODD WILLIAMS,

*Applicant*

On Application for a Writ of Habeas Corpus
Cause No. 2012CR10649-W1 in the 379th District Court
From Bexar County

YEARY, J., filed a dissenting opinion in which SCHENCK, P.J., joined, and in which KEEL, J., joined as to Part IV.

Applicant in this case, Eric Todd Williams, was convicted, in March of 2013, of online solicitation of a minor, pursuant to former Section 33.021(b) of the Texas Penal Code. Acts 2007, 80th Leg., ch. 610, § 2, p. 1167−68, eff. Sept. 1, 2007. He was thereafter sentenced to imprisonment for three years. He now seeks state post-conviction habeas corpus relief, arguing that the Court, in *Ex parte Lo*, 424 S.W.3d

10 (Tex. Crim. App. 2013), declared the statute under which he was convicted to be unconstitutional in violation of the First Amendment to the United States Constitution.[1] U.S. CONST. amend. I. Although his sentence has since discharged, he contends that he is suffering collateral consequences stemming from his conviction.

I have long believed that this Court was clearly wrong when— nearly 12 years ago, in *Lo*—it declared that the former Texas online solicitation of a minor statute was facially unconstitutional in violation of the United States Supreme Court's Overbreadth Doctrine. The Court has not so far shared my view on that question.[2] But more recently, the Supreme Court issued an opinion that has clarified and limited the Overbreadth Doctrine, explaining that it should *only* apply in certain very limited circumstances. So, before granting relief to Applicant, we should at least pause briefly to reconsider whether this Court's decision

---

[1] At the time *Lo* was decided, and when Applicant was convicted, both in 2013, Section 33.021(b) of the Penal Code read:

> (b) A person who is 17 years of age or older commits an offense if, with the intent to arouse or gratify the sexual desire of any person, the person, over the Internet, by electronic mail or text message or other electronic message service or system, or through a commercial online service, intentionally:
>
> > (1) communicates in a sexually explicit manner with a minor; or
> >
> > (2) distributes sexually explicit material to a minor.

Acts 2007, 80th Leg., ch. 610, § 2, p. 1167−68, eff. Sept. 1, 2007.

[2] At this point in time, none of the currently serving judges on this Court were part of the make-up of judges who participated in the decision in *Lo*.

in *Lo* was correct under the Supreme Court's more recent guidance.

## I. THE COURT'S MAJORITY DECISION HERE

### A.

Today, the Court grants Applicant relief based on *Lo*, which was not decided on original submission until approximately six months after Applicant's 2013 conviction became final. In *Lo*, this Court decided that Subsection (b) of the former online solicitation of a minor statute was unconstitutionally overbroad. 424 S.W.3d at 24. But more recently, the Supreme Court, in *United States v. Hansen*, 599 U.S. 762, 769−70 (2023), has clarified the Overbreadth Doctrine in a way that arguably further undermines the Court's decision in *Lo*. The Court should, therefore, not grant relief in *this case* without first addressing the continuing validity of the overbreadth analysis employed in *Lo*, in light of *Hansen*. Because the Court does not, I must respectfully dissent to its failure.

### B.

And, in any event, the Court ought to deny Applicant post-conviction relief because: (1) his conviction was already final when *Lo* was decided, and (2) Applicant cannot demonstrate that his conduct constituted protected speech, or that the statute he was prosecuted for violating operated unconstitutionally as applied to him, in his own case. *See Ex parte Fournier*, 473 S.W.3d 789, 800–805 (Tex. Crim. App. 2015) (Yeary, J., dissenting) (arguing that the Court should not grant retroactive post-conviction habeas corpus relief without first deciding whether such applicants—who were convicted under a statute that this Court had held to be unconstitutionally overbroad—should have to show

that the statute was unconstitutional as applied to them); *Ex parte Mitcham*, 542 S.W.3d 561, 562 n.1 (Tex. Crim. App. 2018) (Yeary, J., dissenting) (citations omitted) (answering that question "in the affirmative"). For this reason, also, I dissent to the Court's granting relief in this case.

## II. CLARIFICATIONS TO OVERBREADTH COMPEL OUR RECONSIDERATION OF *EX PARTE LO* BEFORE GRANTING RELIEF IN THIS CASE

The Supreme Court of the United States recently explained: "An overbreadth challenge is unusual." *Hansen*, 599 U.S. at 769. According to that Court, not only does it permit litigants who typically lack standing to bring a claim asserting only the rights of others, but it also permits declaring a statute facially unconstitutional "even though it [manifestly] has lawful applications[.]" *Id.* (citations omitted). Under this "unusual" doctrine, "a law may be invalidated as overbroad if [only] 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449, n. 6 (2008)). Perhaps given its peculiarity, the doctrine has always been described as "strong medicine" that is employed "only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973).

Recently, the Supreme Court reiterated that the doctrine should not be "'casually employed'" and clarified how to employ it appropriately. *Hansen*, 599 U.S. at 770 (quoting *United States v. Williams*, 553 U.S. 285, 293 (2008)). In *Hansen*, the Supreme Court explained that, to strike down a statute for overbreadth, "a law's unconstitutional applications

must be realistic, not fanciful, and *their number* must be substantially disproportionate to the statute's lawful sweep." *Id.* (emphasis added) (citing *New York State Club Assn., Inc. v. City of New York*, 487 U.S. 1, 14 (1988); *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800–801 (1984)). With respect to that disproportionate number, the Supreme Court further clarified—for the first time—that, "[i]n the absence of *a lopsided ratio*, courts must handle unconstitutional applications as they usually do—case-by-case." *Id.* (emphasis added).

Considering these further clarifications about the Overbreadth Doctrine, I am convinced that *Lo* was clearly wrongly decided. There, this Court dreamed up fanciful, non-realistic applications of then-Section 33.021(b) of the Texas Penal Code—asserting that it covered "a whole cornucopia of 'titillating' or 'dirty talk.'" *Lo*, 424 S.W.3d at 20. I suppose that the *Lo* Court might have argued that the balance of potential unconstitutional applications of the law outweighed the potential constitutional applications of the law in a "lopsided" way, had it ever been asked to consider that question. But it would have been wrong on that account. Moreover, the Court never even wrestled with that question, at least not in a meaningful way, because the Supreme Court at that time had yet to explain that such a showing of lopsidedness should be considered before granting overbreadth relief.

### III. FANCIFUL, UNREALISTIC APPLICATIONS AND FAILURE TO PROPERLY CONSIDER WHETHER THE VALIDITY BALANCE WAS "LOPSIDED" LED THE COURT TO ERR IN *LO*

As is evidenced by the language of the statute itself, and as we later learned from the many 11.07 writ applications forwarded to this

Court after *Lo* was decided, the fanciful applications proposed by the *Lo* Court were clearly *unrealistic. Mitcham*, 542 S.W.3d at 564 (Yeary, J., dissenting) (explaining that *all* the previous real-world applications of then-Penal Code Section 33.021(b) were constitutional). It is also not at all clear that any "lopsided ratio" exists between the *supposed* potential "realistic" unconstitutional applications of the law and the numerous realistic and *actual* potential constitutional applications (including the numerous actual as-applied-constitutional-convictions that were secured by Texas prosecutors) in accordance with the statute's plainly legitimate sweep.[3]

"To judge whether a statute is overbroad," the Supreme Court has explained, "we must first determine what it covers." *Hansen*, 599 U.S. at 770. But the *Lo* Court erroneously identified what then-Section 33.021(b) actually covered. To illustrate, the Court asserted that the statute covered a variety of sexually explicit literature like "Lolita" and Shakespeare's "Troilus and Cressida[,]" television shows and movies like "Rome," "Eyes Wide Shut," and "Basic Instinct," and artwork like "The Rape of the Sabine Women," and "Venus De Milo[.]" *Lo*, 424 S.W.3d at 20. The Court also suggested it might cover a wardrobe malfunction during a sporting event or a "twerking" video during an awards show.

---

[3] Although the Legislature has subsequently amended the online solicitation of a minor statute, Acts 2015, 84th Leg., ch. 61, § 2, p. 1036, eff. Sept. 1, 2015, it is important that we correct potentially errant decisions to ensure that we do not inadvertently do violence to the law and justice ourselves, and so that the lower courts will not be misled by our former precedents. Moreover, because *Lo* was wrongly decided, that is all the more reason (if more were necessary) not to give it retroactive application in post-conviction habeas corpus proceedings! *See* Part IV, *post*.

*Id.* And it chided that "[c]ommunications and materials that, in some manner, 'relate to' sexual conduct comprise much of the art, literature, and entertainment of the world[.]" *Id.* But the Court seemed to simply wave off the State's powerful argument that then-Section 33.021(b) only penalized those who engaged in prohibited conduct with or to a minor and "with the intent to arouse or gratify the sexual desire of any person[.]" *Id.*

The Court instead addressed a different argument of its own making, that "thoughts" are protected by the First Amendment. *See id.* at 25 ("the First Amendment protects thoughts just as it protects speech"); *id.* at 26 & n.72 ("A man's thoughts are his own: he may sit in his armchair and think salacious thoughts, murderous thoughts, discriminatory thoughts, whatever thoughts he chooses, free from the 'thought police.'") (paraphrasing and quoting from GEORGE ORWELL, 1984 bk. 1, ch. 1). But this was a complete red herring argument by the Court. The Court acknowledged, but failed to address, the State's real argument that the *mens rea* requirement built into the law limited its application substantially so that it did not apply in cases where children were exposed to sexually explicit material but without the intent to arouse or gratify sexual desire. *Id.* at 25−26.

It should be further emphasized that the statute did not, as the Court seemed to suggest, simply criminalize thoughts. It instead prohibited actions (communicating "in a sexually explicit manner with a minor" or distributing "sexually explicit material to a minor") taken together with a scienter, or *mens rea*, limited to the specific intent "to arouse or gratify . . . sexual desire[.]" Acts 2007, 80th Leg., ch. 610, § 2,

p. 1167, eff. Sept. 1, 2007. The statute clearly made no attempt to criminalize pure thoughts.

The former statute also did not prohibit the distribution or communication of just *anything* that even "relates to" sexual conduct. *See Lo*, 424 S.W.3d at 17 ("The statute bars . . . any electronic communication or distribution of material that 'relates to' sexual conduct."). It only prohibited such acts when they were targeted at minors and were done *with the required mental state*. For example, any good English teachers who might decide to assign to their students real literature that might just happen to be partly sexually explicit would only do so for educational purposes, not to scratch some sort of prurient itch. As with virtually all crimes, *mens rea* matters. It explicitly and powerfully restricts potential applications of laws from contexts where no evidence of the required mental state exists.

The Court's reading of the former online solicitation of a minor statute in *Lo* also suggested it was convinced that the former statute largely prohibited the widely-distributed and publicly-disseminated materials it described—in books, television shows, movies, public performances, and art. But the statutory language itself, instead explicitly focused on cases in which individuals would "communicate[] . . . *with a minor*[,]" or "distribute[] . . . material *to a minor*." Acts 2007, 80th Leg., ch. 610, § 2, p. 1167−68, eff. Sept. 1, 2007 (emphasis added). This language suggested, in contrast to the Court's fanciful musings, that a more reasonable reading of the statute focused on, and applied more explicitly to, person-to-person communications with minors. It could even be powerfully argued that that statute never had any proper

application at all to broad public distributions and disseminations of materials such as those described by the *Lo* Court. Given the explicit limitations in the statutory language to cases involving communications "with a minor" and distributions "to a minor[,]" it would likely instead have been more appropriate to restrict its application to more predatory-like, one-on-one communications between an adult—with the requisite mental state—and a minor.[4]

---

[4] The *Lo* Court summarily brushed off this argument when the State propounded it in that case. *Lo*, 424 S.W.3d at 26 ("The State suggests that the statute prohibits only one-on-one communications[.]"). In response, the Court offered the purely conclusory criticism that the statute "would apply to one who communicates via the internet with one, ten, or a hundred minors, perhaps sending them salacious selections from 'Lolita' with the intent to tickle their fancy[,]" seeming to suggest that such conduct would have been protected by the First Amendment. *Id.* at 26−27. Surely, however, it would *not* be protected speech for an adult to send salacious selections from "Lolita" directly to *a child* with the "intent to arouse or gratify" anyone's "sexual desire[.]" The statute was designed, after all, to *protect children*, and the Supreme Court has very recently reminded us that states act properly within their power and authority when they seek to prevent children from accessing sexually explicit content. *See e.g., Free Speech Coalition v. Paxton*, 606 U.S. 461, 466 (2025) ("The power to require age verification is within a State's authority to prevent children from accessing sexually explicit content[,]" and "H. B. 1181 [which requires age verification for access to such materials] is a constitutionally permissible exercise of that authority"); *New York v. Ferber*, 458 U.S. 747, 757 (1982) ("The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance.").

That the Court in *Lo* would have thought such communications were protected speech demonstrates the Court's then-failure to perceive the true meaning and scope of our First Amendment Speech guarantees—and the appropriate limits of those guarantees. The statute's clear language suggests a more proper application in the context of person-to-person communications. It should also be determined only in a future as-applied claim whether the law could appropriately be applied where the communication had been sent directly to any number of children more than one at the same time.

The Court suggested in *Lo* that it would be "anomalous to think that a person who makes 'titillating talk' to one minor over the internet may be

Moreover, as I have previously emphasized in my dissenting opinion in *Mitcham*, exactly *none* of the many independently elected prosecutors across Texas who actually had opportunities to apply the law in its history *ever* seem to have brought a prosecution for the kind of broad dissemination of materials suggested by the Court to have been available for prosecution under its terms. *Mitcham*, 542 S.W.3d at 564 (Yeary, J., dissenting). This point is proven, re-proven, and driven home every time another applicant comes to this Court seeking relief from a conviction based on the former statute. No one else, other than this Court, seems to have ever read the law the way the Court did in *Lo* to

---

subject to felony prosecutions, but that same person who makes 'titillating talk' to two or more minors in a chat room or through a mass email is not subject to criminal prosecution." *Lo*, 624 S.W.3d at 27. But that musing by the Court was no more than the invocation of a pure policy consideration, and it had no proper place in its opinion. Simply put, it was not a valid legal argument supporting a determination of unconstitutionality.

Contrary to the *Lo* Court's suggestion, there are extremely rational reasons why the Legislature might have wanted to impose penalties on individuals who would send salacious sexual materials directly "to" children with the intent to arouse or gratify sexual desire, even where it might not have wanted to criminalize public and universal disseminations of the same kinds of materials. Person-to-person communications with children, for example, are more potentially predatory than public, open, and universal publications of materials. Person-to-person communications may invite personal and private responses from children that might not be open to public view. Such communications might also set up further non-public communications between the sponsor of the salacious sexual materials and the children. Parents and guardians might not have access to those communications to check their content. Also, parents and guardians would have a better ability to control what their children see when materials are publicly and universally disseminated, and the public dissemination of materials might also provide them an opportunity to influence their children's proper understanding of such materials as well—but not so when the communications go directly to the children themselves, at least potentially outside the view or knowledge of parents or guardians.

cover widely disseminated television shows, movies, books, and even art.

Accordingly, the *Lo* Court's assessment of the breadth of the former statute was both unrealistic and exceedingly fanciful. Only by disingenuousness may one draw the conclusion that the potential unconstitutional applications of the law so far exceed its potential constitutional applications that it would be proper to describe the balance as "lopsided." *See Hansen*, 599 U.S. at 770. Considering the recent clarifications to the Overbreadth Doctrine made by the Supreme Court, therefore, our reconsideration of *Lo* is compellingly called for in this case. We should not simply grant relief to Applicant without first at least considering whether *Lo* was correctly decided.

### IV. OVERBREADTH AND RETROACTIVITY

In any event, even when a statute *is* truly overbroad in the sense described by the Supreme Court's Overbreadth Doctrine, and therefore properly declared facially unconstitutional, our decision declaring that to be the case should not automatically carry retroactive application in post-conviction 11.07 collateral attacks. *Ex parte Gonzalez*, 664 S.W.3d 838, 843 (Tex. Crim. App. 2022) (Yeary, J., dissenting) ("[W]e should require post-conviction applicants to show that their convictions did not fall within the plainly legitimate sweep of the overbroad statute.").

Typically, to establish that a statute is facially unconstitutional, a litigant "must establish that no set of circumstances exists under which the [challenged statute] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). In that unique circumstance, "Texas has long recognized 'the general rule' that an unconstitutional statute 'is void from its inception[.]'" *Fournier*, 473 S.W.3d at 800 (Yeary, J., dissenting)

(quoting *Reyes v. State*, 753 S.W.2d 382, 383 (Tex. Crim. App. 1988)). It reasonably follows in such cases that any time a penal statute is declared facially unconstitutional—in the sense that it has been found necessarily to be unconstitutional in all its applications—the appellate decision declaring that fact ought to have retroactive effect. *Id.* at 801 ("[I]t was not the judicial decision that nullified the statute; the statute was stillborn."). After all, if a law is unconstitutional in *all* its applications, then it certainly was unconstitutional as applied "to any and every individual ever convicted under that provision, in the future *and in the past*." *Id.* (emphasis added).

But an overbreadth challenge is different from the typical facial challenge. Unlike an ordinary facial challenge—requiring that a law be shown to be unconstitutional in *all* its applications—the Overbreadth Doctrine provides that "a law may be invalidated as overbroad if [only] 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Stevens*, 559 U.S. at 473 (quoting *Washington State Grange*, 552 U.S. at 449, n. 6). By implication, then, when a statute runs afoul of the Overbreadth Doctrine, there might indeed be any number of instances in which the law's applications have been *plainly constitutional*.

A declaration of unconstitutionality in all possible applications is just an observation by a court that a statute cannot be applied consistent with the Constitution. In contrast, a declaration of unconstitutionality for overbreadth is an exercise of brute judicial power enjoining the future enforcement of a statute with some presumptive constitutional breadth. These are very different things.

All of this makes clear to me that the reasoning that undergirds the rationale for declaring laws to be void-from-inception, when they are found to be unconstitutional in all applications (*i.e.*, in the ordinary sense), does not follow in cases where laws are found unconstitutional only for their arguable overbreadth. This is because the Overbreadth Doctrine itself admits that a statute declared unconstitutional on that basis alone may still have been applied, in at least some instances in the past, in a perfectly constitutional manner. And "a court cannot, consistent with separation of powers, enjoin enforcement of a statute where enforcement would be lawful." *Borden v. United States*, 593 U. S. 420, 448 (2021) (Thomas, J., concurring); *see also Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 620 (2021) (Thomas, J., concurring) (citations omitted) ("[T]he Court has no power to enjoin the *lawful* application of a statute just because that statute might be unlawful as-applied in other circumstances.").

Moreover, one of the primary purposes of allowing litigants to claim a statute is overbroad without having to show that their own First Amendment rights had been violated is to prevent the public from having their speech or expression be chilled by the very existence of an overbroad statute. *See Broadrick*, 413 U.S. at 612 ("Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."). But in the case of individuals who come along *after* a statute has already been declared unconstitutionally overbroad, such as

claims like Applicant's that are brought only in post-conviction habeas corpus proceedings, there is no longer the same concern that the allegedly overbroad law might chill the speech or expression of others going forward. There is no longer any need to allow people, who have been previously finally convicted of an offense under the statute, to challenge the law without having to first show that their own rights have been violated.

The benefits of a conclusion that a criminal statute is overbroad should not automatically be applied retroactively to every applicant convicted under that statute who only later seeks relief in post-conviction proceedings. Instead, Texas state post-conviction habeas applicants should be required to show that the law they were convicted for violating operated unconstitutionally as applied to them, in their own cases, before relief should be granted. *See Fournier*, 473 S.W.3d at 803 (Yeary, J., dissenting) ("The windfall that inevitably flows from judicially declaring an overbroad penal provision to be facially unconstitutional need not extend so far as to apply retroactively to grant habeas corpus relief to applicants who have suffered no First Amendment infraction themselves."). Failing to require such a showing violates the constitutionally required separation of powers, *see* TEX. CONST. art. II, and it also affords an unearned and undeserved windfall to applicants who only subsequently seek relief by resort to state post-conviction habeas corpus proceedings.

## V. APPLICANT'S CASE

Applicant in this case entered a negotiated plea of "no-contest" for a sentence of three years. Consequently, we cannot now look to the

record of a trial to determine what evidence would have been presented in satisfaction of the allegations against him. But Applicant's indictment—to which he pled no contest—alleged in pertinent part the following:

> on or about the 10th day of July 2012, [Applicant] . . ., with the intent to arouse or gratify the sexual desire of the defendant or of any person, did intentionally distribute . . . sexually explicit material, to-wit a picture of a lewd exhibition of the genitals, to a minor[.]

As I have said about similar cases, I fail to see how this kind of conduct—sending "a picture of a lewd exhibition of the genitals, to a minor"—even remotely constitutes protected speech.[5] *Ex parte Chavez*, 542 S.W.3d 583, 584 (Tex. Crim. App. 2018) (Yeary, J., dissenting). So, "retroactively declaring [Applicant's] conviction void ab initio would seem arguably to be neither necessary nor just." *Fournier*, 473 S.W.3d at 803 (Yeary, J., dissenting). Instead, it plainly constitutes an unnecessary *injustice*, both to the victim in this case and to the people of our State and our Legislature—which passed, at least in-part, a valid and constitutional law. It is also an abuse of the judicial power.

## VI. CONCLUSION

Before granting relief in this case, the Court should at the very least consider again whether, especially in light of recent Supreme Court precedents, its decision in *Lo* may have been incorrect. Applicant has also failed to demonstrate that the statute he was convicted of violating

---

[5] *Mitcham*, 542 S.W.3d at 564 nn.5–7 (Yeary, J., dissenting) (describing the clearly unprotected-by-the-First Amendment conduct that was charged in numerous other cases in which this Court previously granted state post-conviction habeas corpus relief).

operated unconstitutionally as applied to him. For the reasons discussed above, then, as well as for reasons more fully articulated in my side opinions in cases like *Fournier*, *Chavez*, and *Gonzalez*, relief should be denied.[6] I respectfully dissent.

**FILED:**                                                   October 23, 2025
**PUBLISH**

---

[6] *Fournier*, 473 S.W.3d at 800–805 (Yeary, J., dissenting); *Chavez*, 542 S.W.3d at 584–85 (Yeary, J., dissenting); *Gonzalez*, 664 S.W.3d at 838–843 (Yeary, J., dissenting).